**[Cite as *In re L.P.*, 2021-Ohio-3183.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: L.P.

C.A. No. 29963

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No. DN 19 05 0458

DECISION AND JOURNAL ENTRY

Dated: September 15, 2021

SUTTON, Judge.

{¶1} Appellant, O.P. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to one of her minor children. This Court affirms.

I.

{¶2} Mother is the biological mother of L.P., born January 13, 2018. The father of L.P. is unknown. Mother has an older child, N.P., who was removed from her custody before L.P. was born. N.P. was later placed in the legal custody of her father and is not a party to this appeal.

{¶3} L.P. was born prematurely and, during delivery, suffered a loss of oxygen, which caused significant brain damage. At the time he was born and during the first few months of his life, L.P. was diagnosed with some medical problems but was not yet exhibiting symptoms of numerous additional medical problems and significant developmental delays that would later

affect his ongoing needs. On May 23, 2019, CSB filed a complaint alleging that L.P. was neglected and dependent because of Mother's ongoing case involving her older child and the agency's continued concerns about Mother's mental health and substance abuse problems. The agency had also learned that Mother offered to sell L.P. to someone for $10,000. When police came to Mother's home, they verified that the offer had been communicated via text from her phone.

{¶4} L.P. was later adjudicated a dependent child and was placed in the temporary custody of CSB. The court-ordered case plan focused on Mother completing mental health and substance abuse assessments and following all recommendations; and participating in all of L.P.'s medical appointments so she could understand how to meet his significant needs. Mother was also required to obtain and maintain stable employment and housing.

{¶5} Mother obtained substance abuse and mental health assessments but did not follow through with recommendations for consistent treatment through counseling. Mother began counseling with a number of different providers but was terminated from most of the programs for repeatedly missing her scheduled appointments. Mother continued to exhibit volatile and suicidal behavior throughout this case and was convicted of criminal offenses for causing or threatening violence against other people. Mother's participation in counseling became more consistent after she was ordered into treatment as part of one of her criminal cases.

{¶6} As L.P. grew older, he was diagnosed with numerous additional medical problems and significant developmental delays, which required frequent appointments with medical practitioners and physical and occupational therapists. Mother attended some, but not all, of L.P.'s many appointments. During September 2020, it became apparent that L.P., then one and a half years old and still being fed liquids through a bottle, was not gaining weight even with the

high calorie formula and supplements that he was being fed. L.P. was admitted to the hospital and later had a nasogastric tube ("NG tube") inserted for his feedings. His pediatric gastroenterologist opined that it was imperative for his caregiver to have training to learn, among other things, how to feed L.P. through the NG tube and how to reinsert the tube through his nose and down his throat if he pulled it out. According to the foster mother, L.P. would pull out his NG tube almost every day and she would have to reinsert it. Mother initially refused to participate in the NG tube training because she was overwhelmed by L.P.'s declining health, but she eventually received training about the use and care of L.P.'s NG tube.

{¶7} On September 29, 2020, CSB moved for permanent custody of L.P. During the few months leading up to the permanent custody hearing, L.P. was again admitted to the hospital to have a gastrostomy tube ("G-tube") surgically placed in his stomach. The NG tube was removed and L.P. began receiving all his feedings through the G-tube. Mother did not attend the training about how to feed L.P. through the G-tube and how to clean and care for the G-tube and L.P.'s abdominal wound. Mother told the caseworker that she missed the training because she overslept. Nevertheless, by the time of the permanent custody hearing three months later, Mother had not learned how to use the G-tube and had never fed L.P. through the tube.

{¶8} The caseworker believed that L.P.'s additional health problems had overwhelmed Mother and led to a serious decline in her behavior. Mother admitted that L.P.'s health decline overwhelmed her. She began frequently exhibiting erratic and volatile behavior. By the time of the permanent custody hearing, Mother was facing several additional criminal charges for separate incidents of threatening to harm different people. Mother also stopped complying with CSB's requests for drug screens. Mother admitted to the caseworker that she did not have her

alcohol consumption under control and that, when she drank too much, she made poor choices and engaged in risky behavior.

{¶9} The case proceeded to a permanent custody hearing in February 2021. Following the hearing, the trial court terminated Mother's parental rights and placed L.P. in the permanent custody of CSB. Mother appeals and raises four assignments of error. This Court will rearrange her assignments of error and address two of them together to facilitate review.

II.

### ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ALLOWED [CSB] TO PRESENT EVIDENCE OF [MOTHER'S] PREVIOUS INVOLVEMENT WITH [CSB], IN VIOLATION OF EVIDENTIARY RULE 404(B).

{¶10} Because Mother's third assignment of error challenges the trial court's admission and consideration of certain evidence, it will be addressed first. Mother asserts that the trial court erred by admitting juvenile court records involving her other child, N.P., who was removed from her custody in a prior case and ultimately placed in the legal custody of her father. At the permanent custody hearing, evidence about N.P.'s case was presented through the testimony of several witnesses without any objection from Mother. At the conclusion of CSB's case, it introduced its exhibits, including several documents from the juvenile court record of N.P.'s case.

{¶11} Evid.R. 103(A)(1) requires that an objection to the admissibility of evidence must be timely and "stat[e] the specific ground of objection, if the specific ground was not apparent from the context[.]" Evid.R. 103(D) further states that "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."

{¶12} Mother raised a timely objection to the admissibility of the records from N.P.'s case, but argued only that "I don't find the prior case with the other child is relevant to this case. So I think it's a matter of relevancy." CSB responded that the records were relevant because they pertained to Mother's ongoing parenting problems. The trial court overruled Mother's objection and admitted the records, noting that she would not give them much credence because they predated this case, and the focus of this permanent custody case was on Mother's current ability to parent L.P.

{¶13} On appeal, Mother argues that the trial court committed reversible error by admitting the records from N.P.'s case because they constituted inadmissible character evidence under Evid.R. 404(B). Mother did not raise this argument as a basis for her objection in the trial court. Evid.R. 103(A)(1). Consequently, she has forfeited all but plain error. Although Evid.R. 103(D) permits this court to recognize plain error in the admission of this evidence, Mother has not argued or demonstrated plain error on appeal.

{¶14} It is significant to note that this case involved a child with extensive medical needs, while N.P. had no similar needs. The primary focus of this case was L.P.'s significant medical needs and whether Mother had the ability to meet those needs. Moreover, when the trial court admitted N.P.'s records, it explained that it would assign them little weight because they predated this case. In the judgment entry granting permanent custody, the trial court did not mention N.P.

{¶15} Consequently, Mother has failed to demonstrate that the trial court committed plain error by admitting the records from N.P.'s case. Mother's third assignment of error is overruled.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED PERMANENT CUSTODY TO [CSB] AND TERMINATED MOTHER'S RIGHTS WHEN THE AGENCY DID NOT PROVIDE REASONABLE REUNIFICATION EFFORTS.

{¶16} Mother's second assignment of error is that the trial court erred by granting permanent custody because CSB failed to make reasonable efforts to reunify Mother with L.P. Mother's only criticism of the agency's reunification efforts involve a case plan modification filed on November 17, 2020, almost two months after CSB moved for permanent custody. At that time, CSB proposed that Mother's visits with L.P. be changed from unsupervised to supervised because of renewed concerns about Mother's mental health and substance abuse and her recent arrest on charges of domestic violence.

{¶17} Mother now asserts that, because CSB had renewed concerns about her stability, it should have added more services to the case plan to address those concerns. The record reflects, however, that case plan services were already in place to address Mother's mental health, substance abuse, and her difficulty controlling her anger.

{¶18} Moreover, CSB filed its modification to the case plan pursuant to R.C. 2151.412(F)(2), which requires that a proposed amendment to the case plan be filed with the trial court and served upon the parties. The record reflects that CSB properly filed the proposed case plan amendment and served Mother with a copy. Mother had seven days to file objections to the amended case plan and request a hearing. *Id*. Although Mother could have raised her reasonable efforts argument in the trial court, she did not file objections to the amended case plan. Mother raised no objections to the amended case plan, so it became legally binding on the parties 15 days later, even without the explicit approval of the trial court. R.C. 2151.412(F)(2)(b); *see also In re D.T*., 9th Dist. Summit No. 29876, 2021-Ohio-1650, ¶ 38.

{¶19} By failing to properly raise her argument in the trial court, Mother has forfeited any objection to the amended case plan and does not argue plain error. Because Mother raises no other concerns about the reunification efforts made by CSB, her second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF MOTHER'S MINOR CHILD TO [CSB] AS [CSB] FAILED TO MEET ITS BURDEN OF PROOF AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT COMMITTED PLAIN AND REVERSIBLE ERROR BY GRANTING THE MOTION FOR PERMANENT CUSTODY AND NOT GRANTING EITHER LEGAL CUSTODY TO MOTHER, OR HER REQUEST FOR A SIX-MONTH EXTENSION.

{¶20} Mother's first and fourth assignments of error challenge the merits of the trial court's permanent custody decision, arguing that it was against the weight of the evidence. [1] Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the children are abandoned; orphaned; have been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; one of these children or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the children cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the children, based on an analysis under R.C. 2151.414(D)(1). R.C.

---

[1] Mother also argues that a de novo standard of review applies to the trial court's denial of her request for an extension of temporary custody. She cites no legal authority, and this Court is not aware of any, to support that argument.

2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶21} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶22} The trial court found that the first prong of the permanent custody test was satisfied because L.P. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period. Mother does not challenge that finding but focuses her argument solely on the best interest of the child.

{¶23} Mother argues that, rather than terminating her parental rights, it was in L.P.'s best interest for the trial court to place him in Mother's legal custody or extend temporary custody for another six months. The trial court was required to conduct a best interest analysis to determine whether to grant permanent custody, legal custody, or an extension of temporary custody. *In re R.B.-B.*, 9th Dist. Summit Nos. 29817 and 29832, 2021-Ohio-818, ¶ 20. "This Court has repeatedly held that, if permanent custody to CSB was in the child's best interest, an

alternative disposition necessarily was not." *Id.*, citing *In re S.P.*, 9th Dist. Summit No. 27138, 2014-Ohio-1211, ¶ 10. Moreover, to extend temporary custody, the trial court also would have been required to find that "significant progress" had been made on the case plan. R.C. 2151.415(D)(1). As has been detailed above and will be explained further below, Mother had not made significant progress on the reunification goals of the case plan.

{¶24} When determining a child's best interest, the trial court must consider all relevant factors, including: the interaction and interrelationships of the child, the wishes of the child, the child's custodial history; and his need for permanence in his life and whether such a placement can be achieved without a grant of permanent custody.[2] R.C. 2151.414(D)(1)(a)-(d); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶25} Mother focuses the bulk of her best interest argument on her compliance with the case plan. Although case plan compliance may be relevant to the best interest of the child, it is not determinative. *See In re S.S.*, 9th Dist. Summit Nos. 29511 and 29514, 2020-Ohio-1354, ¶ 15. Moreover, there was evidence before the trial court that Mother had not remedied most of her parenting problems.

{¶26} Although first prong grounds for permanent custody should be established as of the time that the permanent custody motion was filed, "the child's best interest is a fluid concept, as it involves the child's continually-changing need for appropriate care." *In re G.L.S.*, 9th Dist. Summit Nos. 28874 and 28893, 2018-Ohio-1606, ¶ 16. As in *In re G.L.S.*, the permanent custody hearing involving L.P. was held several months after CSB filed its permanent custody motion. *Id.* Consequently, for purposes of reviewing the trial court's finding on the child's best

---

[2] R.C. 2151.414(D)(1)(e) also requires the trial court to consider whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply to this case, but none of those factors are relevant here.

interest, this Court will consider evidence about matters affecting Mother's parenting ability that occurred between the time the motion was filed and the date of the hearing. *Id*.

{¶27} As detailed already, Mother had not substantially complied with the reunification requirements of the case plan. Mother had stable housing but did not have stable employment. She had engaged in some inconsistent mental health and substance abuse treatment but had not stabilized her mental health or controlled her problem with excessive alcohol consumption. Throughout the case, Mother exhibited explosive behavior and periodically threatened to harm other people and/or herself. She had to be physically removed from some appointments because of her combative behavior and was taken to the hospital twice for threatening to kill herself.

{¶28} Mother also admitted to the caseworker that she had a problem with alcohol, but continued to frequently drink to excess and exhibit volatile behavior. Mother had always been drinking when she threatened to harm other people. During this case, Mother was convicted of multiple offenses for harming or threatening to harm other people. At the time of the hearing, she was facing more criminal charges for separate incidents of harassing or threatening to harm several different people. A domestic violence incident against N.P.'s father occurred during October 2020, while N.P. was present in Mother's home. The father left the home with N.P. and reported the incident to the police. Mother was charged with domestic violence shortly afterward. The police officer who responded to Mother's home testified that Mother admitted that she had been drinking. Based on her behavior, blood shot and glassy eyes, and the smell of alcohol, the officer opined that Mother "definitely was highly intoxicated." Because Mother had threatened to kill herself after the police arrived, she was taken to the hospital but was later released to the county jail.

{¶29} During November 2020, Mother's unsupervised visits were suspended and returned to supervised visits because CSB had renewed concerns about Mother's unstable mental health and substance abuse and her recent arrest on charges of domestic violence. Between November and the time of the hearing, Mother became involved in more incidents of alcohol-related domestic violence or harassment. At the time of the hearing, Mother was facing several more criminal charges for causing or threatening violence against other people.

{¶30} Moreover, as will be explained in more detail below, Mother had not learned how to meet L.P.'s medical needs. She did not attend all his medical appointments, did not know how to feed him, and did not accept or understand the severity of his medical and developmental problems.

{¶31} In addressing the specific best interest factors set forth in R.C. 2151.414(D)(1), the trial court was required to consider Mother's interaction with L.P. Their interaction during this case began as supervised visits, later expanded to unsupervised visits, but eventually returned to supervised visits because of Mother's increasingly erratic behavior. Mother points to evidence that she regularly visited L.P. and that their visits went well. During her visits with L.P., however, Mother merely interacted with him, while being supervised by CSB personnel. Since the insertion of L.P.'s G-tube, Mother had never been required to feed him or care for any of his other medical needs. She admitted during her testimony that she has "no idea what the process is" for feeding L.P. through or caring for the G-tube. Mother further testified that she believed that the training was only a 40-minute process and that, if she were given legal custody, she would do the training.

{¶32} Mother had expressed to more than one witness that she did not know how she would care for L.P. and herself and that she sometimes became overwhelmed by the child's

extensive medical needs. Several witnesses expressed concern that Mother had not been trained about the use of the G-tube, L.P.'s primary means of receiving nutrition at that time. As one witness explained, if L.P. pulls out the G-tube, it cannot be reinserted at home as the NG tube could. Instead, the caregiver would need to immediately take the child to the hospital.

{¶33} Mother's failure to learn how to use the G-tube and her history of becoming overwhelmed when L.P.'s medical needs increased were concerning to everyone. When asked what she would do if she became overwhelmed with L.P.'s needs if he were returned to her custody, Mother testified that she would just "deal with it." She had never demonstrated that she would be able to do that, however. The trial court expressed particular concern that Mother had not stabilized her mental health and continued to drink to excess. As the trial court emphasized, Mother's continued erratic behavior and consumption of alcohol could "create a life-and-death risk" for this medically fragile child.

{¶34} There was also evidence before the trial court that Mother did not attend all of L.P.'s medical appointments and did not seem to accept or understand some of his diagnoses. L.P. had suffered brain damage during birth and, as a result, had serious, ongoing medical problems and significant developmental delays. Nevertheless, without any medical expert opinion to support her belief, Mother testified that she thought L.P. would eventually outgrow his significant medical problems and developmental delays and become "normal."

{¶35} Because L.P. was only two years old at the time of the hearing and was cognitively delayed, he was unable to express his wishes. The guardian ad litem spoke on his behalf and opined that permanent custody was in the best interest of L.P. She expressed concern that, although Mother had tried to comply with the case plan, she continued to exhibit impulsive behavior and engage in criminal conduct. The guardian ad litem also expressed concern that

Mother had not learned how to meet L.P.'s medical needs, became overwhelmed by his demanding needs, and continued to abuse alcohol and threaten self-harm. Given all of Mother's problems, the guardian ad litem did not believe that she had the ability to appropriately care for L.P.

{¶36} Finally, L.P. has spent most of his life living in foster care. He has significant medical and developmental needs and requires a legally secure permanent placement. The evidence before the trial court demonstrated that Mother was not prepared to provide L.P. with a safe and stable home or to meet his medical needs. CSB had been unable to find another suitable relative or friend who was willing and able to provide him with a permanent home. Consequently, there was evidence before the trial court to support a conclusion that a legally secure permanent home would only be achieved by granting CSB permanent custody.

{¶37} Given the evidence presented at the hearing, Mother has failed to demonstrate that the trial court lost its way by concluding that permanent custody to CSB was in the best interest of L.P. Mother's first and fourth assignments of error are overruled.

III.

{¶38} Mother's assignments of error are overruled. The judgment of the Summit County Court of Commons Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETTY SUTTON
FOR THE COURT

CARR, P. J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

JASON D. WALLACE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.